08-1521, table versus velocity of the body. Good morning, Counsel. Good morning, Your Honors. My name is Michael Suka. I'm here on behalf of Kalanta Robinson. May it please the Court, this morning I'd like to focus on the first issue of my brief regarding the failure to ensure that Mr. Robinson was fit to stand trial. But I'd be happy to answer any questions that I've raised in the brief. It's a fundamental requirement for every criminal trial that the defendant is fit. In this case, there were several concerns regarding Mr. Robinson's fitness that arose before trial, as well as during trial, and the trial court failed to ensure, in fact, that Mr. Robinson was fit to stand trial. How many times was he seen? By my count, maybe I'm wrong. It's got to be around six. He was, there's actually, I think, I think there's actually 12 instances where a doctor... Six, 12, picky, picky. That many? Did anyone, anyone ever say he was not fit to stand trial? A doctor never concluded that he was unfit to stand trial. And I'd like to focus on what occurred during trial that constitute that there was a bona fide doubt of his fitness raised. And when Mr. Robinson attempted to commit suicide on the second day of proceedings. Now, at that point, there's several factors that together as a whole constitute a bona fide doubt, and it was, despite all the prior reports, there was a concern at that time that Judge Etchingham should have ensured that Mr. Robinson was fit. This was the middle of trial. Well, how would Judge Etchingham do that? Tell me in your own words what you think Judge Etchingham should have done. Well, I think, again, the factors in play here, including Defense Counsel's assertions that Mr. Robinson was unable to communicate about what was going on with the trial. But Judge Etchingham said that he observed the defendant talking with his lawyer, having an exchange, and he seemed, quote, unquote, lucid. I mean, is the judge allowed to use what he observes in the courtroom as part of his determination as to whether or not this defendant is, in fact, participating in his defense? Certainly. But here, what Judge Etchingham said on the record, he said from what he saw, Mr. Robinson appeared to be with it. And I saw him discussing with co-counsel, there was a back and forth. And I would just emphasize, too, that Judge Etchingham's opinion about Mr. Robinson's demeanor did not occur until the end of the second day of trial when counsel renewed his objections. And counsel had said that there had been ongoing problems. But I don't think what Judge Etchingham observed rebutts what counsel was saying. Counsel was saying that when we're discussing the trial with Mr. Robinson, he's unable to communicate about the trial. So there's nothing that Judge Etchingham did not engage with Mr. Robinson to see. It was just his observations. But answer my question, what is it that you think Judge Etchingham should have done at that point that he didn't do specifically? Well, he should have ensured, you know, he should have ensured that Mr. Robinson was fit to stand trial. Why would he do that? By ordering another fitness evaluation. Counsel had several recommendations, including asking at least for a continuance and to get another evaluation and another hearing, if necessary. This man had had at least 10, 12 evaluations. He had been seen on about a dozen different occasions. And you believe that the judge should have ordered a 13th examination based on what counsel was saying to him during the second day of trial. Is that your position? Not just what counsel was saying, but the fact that Mr. Robinson had attempted to commit suicide as well. And I think, you know, I cited in my case people v. Shorack where the judge, the trial judge in that case said, you know, we found him fit before and he did not act on the concerns that arose during trial and after trial. Similarly here, just, you know, fitness, defendants are required to be fit at all stages of the prosecution. So, you know, the reports finding him fit before do not account for what was going on during trial. When counsel, as an officer of the court, was informing the judge, we can't communicate with the client. There's evidence coming out, we can't discuss that with them. And I think it's notable, too, that in this case it was a jury trial and defense counsel did not give an opening statement to the jury. And, you know, that's an unusual step. Unless, of course, defense counsel was having difficulty communicating with his client. And so, you know, defense counsel said, you know, it's not just the suicide. We've been having difficulty on day one. We hoped his condition would improve. It's gotten worse. He spent the morning at the hospital getting treatment for an attempted suicide. And in terms of the prior opinions, those, you know, some of that information was stale. You know, it was not addressing what was going on at that moment. And again, Judge Etchingham had a duty to ensure Mr. Robinson was fit at that time, not to just reflect on he's been fit before. You know, there is no limit on, you know, there's no limit on how many reports there has to be. We agree on that, counsel, but I'm still trying to get you to tell me what it is precisely that you wanted Judge Etchingham to do at that point in time when defense counsel made yet another motion for another examination. Judge Etchingham should have continued the case to make sure Mr. Robinson was fit. And how does he do that? He should have ordered another clinical examination to have a doctor meet with Mr. Robinson again to ensure his mental state at that period of time that he was fit to stand trial. And that's what defense counsel was asking, and that's what, when there's a bona fide doubt, when the facts surrounding what's going on constitute a bona fide doubt, that's the judge's duty. Judge Etchingham also mentioned that he had a letter from one of the examining physicians that perhaps defendant was malingering. Perhaps he was exaggerating some of these symptoms in order to delay the trial and to malinger. That, coupled with Judge Etchingham's own observation that the defendant was with it and lucid, would that in any way influence how the judge resolved this issue as to whether or not the trial should go forward? Well, I think there's two points with, you know, and Judge Etchingham did quote one of the reports from Dr. Nadkarni, which was done in December of 2006. Now, this is the trial in October of 2007. So 10 months earlier, he's relying on what Dr. Nadkarni is seeing. So this is stale information, but I would also add that when Dr. Nadkarni met with Mr. Robinson in December, that was before, you know, another incident where Mr. Robinson had self-soiling, you know, he was smearing feces on himself. And there was also, that was before Mr. Robinson went from threatening suicide to acting on those threats. There was a, he attempted to commit suicide in May of 2007, as well as during the middle of trial. So the report that Dr., that Judge Etchingham referred to was old information. It did not reflect what was going on at that moment. I was talking about the letter referring to the malingering. That's different from the report that you're talking about. Yeah, and regarding the malingering, there's a critical problem with the opinion that Mr. Robinson, all this bizarre behavior by Mr. Robinson was just malingering. And again, I want to mention that all these proceedings, the prior proceedings, were done with different judges and different attorneys. Now, during one of the fitness proceedings with Judge Lynn, defense counsel asked Judge Lynn to, and this is pursuant to the fitness statute, allows him the appointment of his own expert for the purpose of rebutting that doctor's, the doctor's opinion that he was malingering. What did Judge Lynn do with that request? He flatly rejected it. He said, that's manipulation to the nth degree. Well, that's the. Well, I would. Well, the statute doesn't say shall. It says may. Does it not? Well, it does say may, but this, an opinion from this district, people be valo said, although the statute says may, the Illinois Supreme Court has interpreted that provision to mandate the appointment of at least one expert. And that opinion, the Supreme Court opinion, Kinyon, said that such experts are essential to the defense of indigent defendants. This guy had about 12 experts. Same people at different times, right? Just to place his request in context, this was in, I believe, May or June of 2007. Now, only one doctor had been seeing Mr. Robinson the past few months, and it was Dr. Echevarria who said that Mr. Robinson was malingering, and it was that precise opinion is what, so, you know, that's the opinion that defense counsel was seeking to rebut. If I recall, the doctor didn't say that. He said that he may be malingering, but he couldn't tell because the defendant wouldn't cooperate with him. Right. I think that it goes also to, you know, the statute does say may, but to the extent the importance of giving this appointment of an expert, the judge's discretion is limited in this context, and I think when Judge Lynn said, oh, you know, he's malingering, that's not precisely what Dr. Echevarria. Judge Lynn didn't say he was malingering. Judge Lynn said that he had to cooperate with the system, that he had to cooperate with what the system has to offer, and then with respect to that cooperation, if he cooperates, then it sounded like he was saying you can raise the motion again, but he said he has to cooperate with what we've got first. He never said that the defendant was malingering, as I recall. Well, I think that conflicts with some of the importance that this right is given, and that's as articulated in this district's opinion in Ballot, but also I think it's fundamentally unfair for Judge Lynn to say you have to cooperate with what's going on here when that's the opinion that Mr. Robinson is attempting to rebut. He's saying I'm not malingering. I'm having a little trouble here because the context within which defense counsel raised the issue with Judge Lynn regarding having a private physician do this, it was not my understanding that he said because the court-appointed physicians are finding something that we think isn't there or he didn't agree with. He just basically asked for a private, we would like a private doctor. It was never raised because we want to challenge this malingering, this allegation of malingering. That wasn't my understanding at all. Well, I think looking at the record and the way defense counsel brought it up, that was the last opinion that Dr. Echevarria gave was he's not cooperating, and I believe this is not related to fitness, I believe it's malingering. Judge Lynn said he's not cooperating, so I'm not going to allow you to get this expert. And I think defense counsel, what he explained was I think Dr. Echevarria is hung up on the matter or something to that effect. Dr. Echevarria is the same doctor that had been seeing Mr. Robinson, and I think clearly he's trying to address the opinions that Dr. Echevarria is reaching, and he's trying under the statute, which entitles him to that expert of his choice, to rebut what's going on with Dr. Echevarria. There needs to be something brought forward to this judge other than we just want another expert because we don't like the results of the examinations of the other two, because by that time he had been examined by Dr. Matt Carney as well, and Dr. Echevarria multiple times. And they all, as Justice Carnez has asked you earlier, was there ever any finding that this defendant wasn't fit in all of the prior multiple examinations that he had had? Well, I think, again, trying to focus on what occurred on the second day of trial, Judge Etchingham dismissed what counsel was saying because, well, these doctors have found him to be malingering. That's not true, and that's being elevated. I think you're elevating that above the level of what I recognize this in the record. That was mentioned one time. It was a letter that was written to the judge basically saying he may be malingering, but I can't tell because he wouldn't cooperate. The defendant then went back and had another examination, and that malingering letter was put aside. Nobody ever elevated it after that, as far as I can tell. He had a subsequent BCX after that letter claiming that he may be malingering, and the judges never raised that. Throughout the record, I see no place where the judges raised that as the reason for either not allowing a private physician or anything, so I'm not sure what the importance of that is. Well, the importance of having his own expert, I think the record shows that he was, the difficulties with Dr. Etcheverry, that's why he wanted to have his own expert, and I think it's relevant to the rest of the case, including what's happening on the second day of trial, because Judge Etchingham did not recite that letter. What he did was recite Dr. Nacarny's conclusions that this bizarre behavior is volitional, and I think the record shows that essentially when he's acting out, that's by choice, and he's trying to delay things. I think that's related to the malingering opinion, and I think if Judge Lynn had allowed that opinion, there would be a more complete record, and Mr. Robinson would have the right to present evidence, or at least to cross-examine the experts that were saying that this behavior is volitional. It's not related to his fitness. He could have done that anyway. They didn't do that, but there was nothing preventing them from, preventing defense counsel from cross-examining Dr. Etcheverry or Dr. Nacarny or any of the court-appointed experts, was there? No, but I think what Ballot, and again this district's opinion in Ballot, I think we all recognize that what's the value of this expert of your choice for an indigent defendant who doesn't have the funds to hire his own expert? The value is not just to prevent or provide another opinion, but it's also to help counsel on how to cross-examine that expert. So I think at the hearing... The defense counsel could not or did not cross-examine Dr. Etcheverry or Dr. Nacarny because he didn't have the benefit of having had a private expert of his own? Is that your argument? I believe so, yes. And I think that's part of what, and again focusing on what happened on the second day of trial when Judge Etchingham is saying look at the body of all these reports, putting it in context... So just so I'm clear, if a defendant does not have a privately appointed or retained medical expert, he is not able to cross-examine the state's, the court-appointed expert, that's your position? No, of course a defendant and defense counsel can always cross... He doesn't need to have his own private expert in order to cross-examine. I think the point here is that there was an opinion by Dr. Etchevery that defense counsel asked for an expert in order... He did ask for an expert in lieu of what was going on with Dr. Etchevery. And obviously the appointment of your own expert, the purpose of that is to rebut what the court-appointed experts are saying or to help guide counsel on how to cross-examine. I'm not sure if I agree with that. The purpose of that is to get an accurate reading as to whether or not this person is fit for trial. And I would imagine that the experts, whether they're appointed by the court or they're privately retained, they're all looking at this, they're all focused on the same goal, determining whether or not that person is fit for trial. Isn't that what the expert is supposed to do no matter who retains them? Sure, but I think... So it stands to reason that if the person has a private expert, you can't assume that the private expert is going to come to a different conclusion from the court-appointed expert, can you? Well, again, I would refer to this Court's opinion in Ballot. And this Court rejected the State's argument that, well, we don't know that this expert was going to do anything to rebut. But Ballot rejected that argument that precisely we don't know. But I'm asking you with respect to the facts of this case. Right, and I would argue that the failure to appoint an expert, the prejudice is not known. What could have happened is there could have been another... That expert could have said, no, this behavior is not volitional, it is related to his fitness, and that could have changed things for what occurred at trial with Judge Etchingham. That this suicide attempt wasn't just a delay tactic, which is what Judge Etchingham characterized it as. So I think that is, in terms of this case, that's the harm in not allowing Mr. Robinson and his defense attorney the opportunity to have the court appoint an expert of his choice. Also, I would also add a few points in terms of, you know, other facts in this case that undermine Judge Etchingham's reliance on these prior reports. Again, as I've said, the reports were months old, and including the one that Judge Etchingham quoted was 10 months old, well before Robinson had increased problems. And, you know, the more recent reports were just letters from Dr. Etcheberry. They weren't full-fledged reports that articulated exactly what he was relying on. And I think it's notable that in the pre-sentence investigation, there's a diagnosis that Mr. Robinson had bipolar disorder and paranoid schizophrenia, which isn't reflected in the report. So I think some of these facts... It doesn't. But what it does, I think, is undermine the reliance that Judge Etchingham relied on these reports. I think the record shows that when defense counsel was, as an officer of the court, was expressing his deep concern about what was going on with Mr. Robinson, Judge Etchingham said, look at the reports. There's nothing in here that says he's unfit. But again, there's facts in this case that undermine the reliability of the reports. He wasn't given an opportunity to talk with his own expert who may have provided information that undermined the accuracy of what Dr. Etcheberry was saying. The report that he quoted was 10 months earlier, before other things occurred. And again, another element of this case is that the proceedings were divided among different judges and different attorneys. And just the process of parsing out this fitness over here and the trial proceedings over here inevitably undermines the accuracy of what was going on with these previous proceedings. And I think just to conclude, and again, I want to focus this morning on what occurred during the second day of trial. I'd like you to touch briefly on that 431B issue also. Sure. I think just to, on that issue, just to When you get to it, it sounded like you were not going to touch on that. Yeah. So let me finish on the first issue and then I'll touch on the 431B issue. I would just want to emphasize today for purposes of argument that what occurred on the second day of trial when Mr. Robinson attempted to commit suicide and counsel as an officer of the court was saying, I cannot communicate with my client and he cannot assist in his defense, which is the definition of an unfit defendant, that a bona fide doubt was raised and Judge Etchingham should have ordered a fitness evaluation hearing to ensure he was fit. And therefore, we would respectfully request that his conviction be reversed and remanded for a new trial on that issue. And touching on the 431B issue, just beyond what I've raised in the briefs, I would add that currently in the Illinois Supreme Court, the case of People v. Thompson is, the issue litigated there is whether a violation of the rule constitutes reversible error. And hopefully that opinion will provide guidance in terms of whether the error here would be reversible or not. But regardless of the outcome of that case, we contend that the failure to comply with the rule was not harmless under the facts of this case and that the issue of intent, Mr. Robinson's intent, was a closely balanced issue and the failure to comply with Rule 431B was therefore not, it was not harmless. How did the judge in this case fail to comply with 431B? It sounds, it seemed to me that he covered all points. You know, usually they forget about the one about the fact that he does, you know, the defendant does not have to testify in a presentative evidence. One of those two. But he hit them all, didn't he? The first, Mr. Robinson's presumption of innocence, the judge did not ensure that the jury understood that principle. And I think it's, you know, it's, that's what the rule requires, that the jury understands and accepts these four principles. That's clearly required in the rule and the judge not ensured the jury understood that principle. So what you're saying is he talked about them, but he didn't say, do you understand what I'm saying? Yes. And I think, yes, and I think it's, you know, someone cannot accept what they don't understand. And I think that's part of why the rule is written the way it is, to ensure that people understand and accept all these four principles. And I think the amended rule, you know, requiring, placing upon the judge the sua sponte duty to make sure that the jury understands and accepts, shows that unlike Glasper, you know, whereas the default there was the defendant must request, this is required in every trial. And I think that change reflects an increased, you know, importance on compliance with the rule. And when the judge not, and so what we have is there was a failure to understand, we don't know if the jury understood Mr. Robinson's presumption of innocence. And it's not harmless in this case because the closely balanced issue was Mr. Robinson's intent. Did he intend to kill or not? So you're basically quibbling about the difference, they may have accepted it, but maybe they didn't understand what they were accepting. Is that what you're saying? Based on the clear requirements of the rule. That's what's clearly required in the rule, that the judge can't, it's not just that the jury accepts, it's that the jury understands and accepts. They understand it. So they can nod their head or indicate, yes, we accept it, but the next step has to be, and do you understand it? That's what you're saying. And the judge, by asking do they accept this but not do you understand it, he didn't comply with Rule 431B. That's your argument. Correct. And there's decisions, Arredondo and Wilmington from this district that hold the failure to, you know, that's not just a meaningless distinction. That's what the rule requires. So it's not compliance when the judge doesn't do what the rule requires. So, again, on that issue, we would request that Mr. Robinson's convictions be reversed and remanded for a new trial. Thank you. Thank you. Assistant State's Attorney Ugo Abuzi for the people of the State of Illinois. Good morning, counsel. Good morning, Your Honors. May it please the Court, the people maintain that the defendant received a full and fair fitness hearing in this case on June 22, 2007 in compliance with the statute. When Judge Sachs said, I don't have it in front of me, I'll stipulate to that. It's not going to make any difference one way or another. Is that a hearing? Your Honor, at this point, we would move away from our previous argument, and we would agree that the initial hearing did have some defects. However, we would argue. It wasn't a hearing at all, was it? We would agree with that intent, Your Honor. We would argue that on June 22, 2007, in front of Judge Lynn, the defendant did receive a full and fair fitness hearing. In fact, at that hearing, the parties stipulated that Dr. Echevarria, the examining psychiatrist, would testify that the defendant, I quote, verbalized an understanding of the charge, the nature, purpose of the court proceedings against him, the roles of various corporate personnel, end quote, and quote again, that he should be fully capable of assisting counsel in his defense, end quote. That's exactly what the statute requires, the defendant understand the nature and purpose of the proceedings, and that he be able to assist in his own defense. Dr. Echevarria would testify that the defendant is mentally fit to stand trial with medication. Okay. But given the we agree that the statute is not mandatory. It is, you know, discretionary so that he may have his own. Given the fact that he had had what amounted to a sham hearing before Judge Sachs in the first place, it was not a hearing, and this, this, by this time, this defendant had had so many, it was back and forth so many times. Why not let him have his own expert? The State objected to that. Why? Well, Your Honor, I would point out, as Your Honor pointed out during defense counsel's argument, that the, that Judge Lynn didn't outright deny the request. Judge Lynn said before we, he's got to cooperate first with what we've got. He's not cooperating. If he doesn't cooperate with them, he's not going to cooperate with private counsel. The denial was conditional. The defense was not precluded from coming back after Judge Echevarria examined him and saying, okay, Your Honor, now that he's complied, can we have a private exam that we requested previously? Defense didn't do that. And so the denial was not outright. It was conditional. Okay. Let's, let's jump ahead to his argument about the second day of trial. Hadn't the defendant's condition and the situation really changed significantly since the last BCX and the last examination, which was essentially almost a year earlier? Hadn't his situation changed? I don't know that it had, Your Honor. I think when we look at that, defense counsel points out that the fact that the defendant in this case, in this situation, had attempted to commit suicide. But the case law suggests that an attempt at suicide does not necessarily go to defendant's fitness, because it doesn't speak to defendant's ability to understand the nature and purpose of the proceedings and to assist in his own defense, which, again, is what the statute requires. Under People v. George and People v. Lopez, the court found that suicide attempts alone were not sufficient. And I would point defendant to People v. Sanchez, where the court found that in a situation where the defendant had attempted to commit suicide the morning of sentencing and the judge found that there was no bonafide doubt, the appellate court found that the judge did not abuse his discretion in that situation. And, again, the standard here is abuse of discretion. Did the judge abuse his discretion in finding that there was no bonafide doubt? We maintain that he didn't. The judge had all available information to him. The People submitted a complete set of medical records. It's People's Exhibit 75 to the court. The court was informed by defense counsel himself that the defendant had attempted to commit suicide, that he was on a cooperative. The judge had all that before him. So the issue is that the judge abuses discretion. We maintain that he did not. Your opponent raises a point, which is a valid point, that given the nature of the system, there was no continuity here. It was a lot of different lawyers, a lot of different judges, many different examinations by two different doctors. So although there was a whole body of information, it was not a continuum preceding before the same judge so that the judge could see either the improvement or the deterioration of this defendant. It was basically just snapshots. I mean, he didn't use that word, but that's basically what he was saying. So under those circumstances, why not let him have, A, a private counsel, and, B, another BCX at the time of the motion by defense counsel on the second day of trial, when defense counsel claimed that the defendant was essentially deteriorating. He used a word like decompensating. I can't communicate with him, and he's doing bizarre things. Why not? What harm would that cause? Let me address just the first portion of that question, Your Honor, first. With regard to the defense's argument that there are different judges and different attorneys, and the defendant essentially argued that because of the differences in all these people, that the judges did not have all the information available to them. But nothing precluded the defense from presenting all this information to Judge Linn at the hearing. The defense had the opportunity to present transcripts from the previous status hearings, had the opportunity to call a defendant's previous attorney to the stand and question him about his opinion regarding defendant's fitness. They had the opportunity to call Dr. Echiriria and, for that matter, Dr. Nidkarni, both of which examined the defendant, and they didn't. The defendant can now, in retrospect, several years later, complain that the judges didn't have all the information before them when he had every opportunity to call those people, and they chose not to. With regard to the judge's point about why not grant a private examination, again, when we look at the statute, the statute clearly, this plain and ordinary language of the statute clearly grants the trial court discretion. It uses the word may. In a previous subsection, it uses the word shall. The court shall have, shall appoint an expert of its own choice. In Section E, it says the court may appoint when the defendant requests. May is suggesting that it's permissive. Defendant points to people who vallow, but vallow is distinguishable on many accounts. I know that. What I was asking you is given the history of this case, which we have, I think we would all agree, is somewhat convoluted, lengthy, and a lot of the back and forth, why not? Although it says may, that's why may presents an opportunity for the judge to look at all of the factors and determine, gee, under these circumstances, I really should do it. And if he doesn't do it under the circumstances when he should, that's the abuse of discretion. So I'm asking you, under all of these circumstances, why not? Well, Your Honor, I think as I pointed out previously, the judge didn't outright say no. He said the judge apparently concerned with efficiency after six BCXs, complete BCXs, and several incomplete BCXs, if you will, where the defendant didn't cooperate. The judge said no. He's got to cooperate first. If he's not cooperating with what we've got now, he's not going to cooperate with a private examination. First he's got to cooperate. He didn't say absolutely not, no way, case closed. He said first. Again, the defendant could have come back and said, all right, he's cooperated. Now we'd like to have that private examination subsequent to the previous one. That didn't happen. So I think that, again, the judge didn't outright say no. It was conditional. And we would argue that that doesn't amount to an abuse of discretion, which is the standard for the judge's determination here. With regard to why not find a bona fide doubt, again, the judge didn't. He had his discretion. He had all the information available before him. And he didn't find a bona fide doubt. And, again, this is information consisting of six BCXs. As Justice Karnes has pointed out, all finding defendants fit for trial. We didn't have one situation here where a doctor said, no, he's not fit. They all found him fit. The judge had that before him. The judge had all the information. And he exercised properly his discretion to find the defendant was fit for trial and that there was no bona fide doubt of his fitness. With regard to defendants, excuse me just one second. We would also point out, Your Honor, that actually with regard to that same point, that the judge also had the benefit, Judge Etchingham, of having observed defendant prior to that at motions to suppress and motions to quash and suppress. Where the defendant testified lucidly. He testified responsibly to defense counsel's questions. And he testified in conjunction with the defense's theory at those motions. Furthermore, on the day after the judge found no bona fide doubt, it was the day after, two days after, defendant testified at the trial. Again, testified lucidly, responsibly, and in conjunction with the defense's theory at trial. And that's one of the Hansen factors, Your Honor. In the Supreme Court laid out three relevant factors in considering whether a bona fide doubt existed. In Hansen, which cited Edmonds, the first being defense counsel's, or the trial court's observation of defendant's demeanor and their observation of his behavior. The judge had all that here. And the judge considered all that and found no bona fide doubt. The judge also had, in conjunction with the Hansen factors, the medical records available, which the people presented as evidence to him. Considered those, and he found that there was no bona fide doubt. Lastly, he had the defense counsel's statements, his opinion as to the competence of defendant, and he found that there was no bona fide doubt. Considering all the defense counsel's statements at the time that he asked, telling the judge that he believed that the defendant wasn't, essentially wasn't competent, wasn't able to communicate with him, and the defendant had inflicted wounds to his wrists. He had that information, found no bona fide doubt. After considering those factors, it's clear the judge didn't abuse his discretion here. He acted properly within his discretion in finding no bona fide doubt. I'd like to just address one thing related to defendant's request. Should this court find that the fitness hearings were insufficient, including the one on June 22nd, ask that this case be reversed and remanded for a new trial. We would argue, Your Honor, that should this court reach that decision, the proper remedy would actually be to remand for retrospective fitness hearing. One, using the contemporaneous medical evidence available during the trial, and then determine if the defendant was or was not fit at that time. To address the Judge Cunningham's questions regarding the 431B issue, we would point this court to this court's own opinion in People v. Haynes, which was not cited in our brief because it came out after we filed our brief, but we will be filing a motion to supplement, or excuse me, to cite additional authority. I would do it fast, counsel. Certainly, Your Honor. We'll do that this afternoon, in fact. In that case, this court found that People v. Glasper and People v. Magallanes, which the first district also found, did apply to post-amendment 431B. And that's the case we have here. We have overwhelming evidence of defendant's guilt in this case. The defendant had two eyewitnesses, the two victims, who testified the defendant stabbed them, and in fact told them that he, I believe he told Ms. Scott, that he was going to kill her. At the time that he was stabbing her. We have a third party who spoke to the defendant prior to the incident occurring, who was told on the phone by the defendant that he was going to kill them, and that if she read something in the news about somebody being stabbed, I think essentially not to be surprised was the, in summary, the statements. And we have defendant's own statement given to the Assistant State's Attorney, indicating that he stabbed the two victims. The evidence here is overwhelming. And we would argue that any errors in reading in 431, in giving the 431B admonitions were harmless beyond a reasonable doubt. But as Your Honors pointed out, we would argue that there actually were no errors. The statute was substantially complied with, which is what People v. Vargas calls for. The judge gave all the admonitions, acknowledged that he did not say accept and understand in all situations, but he substantially complied with the statute, or excuse me, with the rule. Therefore, Your Honors, for all those reasons and those stated in our brief, we would ask that this court affirm defendant's conviction for attempted murder, home invasion, aggravated battery, and certainly not. You know, I have to ask you about the third issue, and I didn't ask him, but I'll give, you know, the one crime, one act issue, the third issue. We all glossed over that. But I just want to ask you, the State could have charged Mr. Robinson on separately for each of those stabbings, and they chose not to do that. So that being the case, how can you then argue that they're all individual, they're individual crimes? Well, Your Honor, we would argue that as the court in Crespo did in evaluating the people's theory at trial and finding the opposite conclusion, we're asking this court to find that it was one act and not separate acts, that when you look at the people's theory at trial here and the evidence elicited, it's clear that they intended for each stab to be treated as a separate act. At trial, the people listed testimony that ---- In this case, you're saying it was clear that they intended for each stab wound to be treated as a separate act? Your Honor, we would argue that the way the evidence was presented, the way the evidence was argued at trial, the people intended that. Certainly, as Your Honor pointed out, the indictment could have been clear in indicating that. Well, then there was nothing at all in it that ---- It wasn't in the indictment. Certainly, Your Honor. The indictment stated repeated stabbings. We would argue that at trial the nature of the evidence in indicating the different injuries and the way that the people argue it, that theory suggests that they did intend to treat it as separate acts. Well, doesn't the defendant have a right to know that before he's in the middle of defending it? I mean, there's nothing about what I read that suggests to me the argument that you're making now. And I know lawyers are clever people and you have to make these arguments. However, there's nothing that I read that suggests that supports what you're saying. I mean, the State has ultimate discretion to decide how to charge someone. You have to use that discretion to support what you're going to later argue. And I don't know that you did that here. Again, Your Honor, we would stand by our argument. We would argue that the theory at trial and then certainly wouldn't disagree that the indictment could have been clearer, but we would argue there are theory-supported individual acts. Thank you. Thank you. For all those reasons, those in a brief, we ask that this Court affirm the defendant's convictions. Thank you. Thank you, Mr. Wilson. Just a few points. The State argues that Mr. Robinson appeared to testify lucidly on the third day of trial. But thinness is a requirement that applies to all critical stages of the trial proceedings. How do you pronounce your name? Sukup. Mr. Sukup. Following up on what your opponent said, why didn't the defense counsel renew his motion for a private examination? I think if you had done that, you would certainly have a stronger argument. I mean, according to your opponent, Judge Lynn's denial, and we're putting aside Judd Sachs, now we're only dealing with the hearing that took place before Judge Lynn, and the denial was, quote, conditional, according to Mr. Buzzi. And, you know, if that's the case, wouldn't it have been helpful for you to have read? There was nothing that I read in the record where the judge said, and don't bring that motion again, because sometimes trial judges do that. He didn't do that in this case. He basically said, you have to cooperate with what we have first. And Mr. Buzzi makes a good point. That infers that, okay, you cooperate first, and then come back and we'll see what happens after that. But nobody came back after that with a motion, did they? Well, in terms of what defense counsel did on that following hearing, I think the way that Judge Lynn rejected his request the first time, and he said, don't bring it up again, but he said something. He didn't say that. I'm sorry? He didn't say that. No, he did not say that. What he did say was, it's out of the question, forget about it, don't bring it. Right now. Right. And so I think the message to defense counsel was, forget about it. And I think that, you know, at the next hearing, even Mr. Robinson tried to speak up and explain what the difficulties were, and the judge said, no, no, no, that's not what's written in this report. I think it's clear from the way that Judge Lynn handled that request that he made it clear that there was no way that he was going to get that. But, Mr. Suka, defense lawyers can't allow themselves to be scared off by a judge's demeanor. The judge did not say, do not bring this motion again. The judge said he has to cooperate with what we have first. So isn't it as reasonable to infer, as your opponent says, that you have to cooperate first, and then we'll see, and then bring it again? But he never tested that. He never tested the judge on that. That motion was never brought again. Well, I think I cited in my brief to the case of People v. Walker, and I think that provides some guidance here. The facts are different, but in People v. Walker, defense counsel the first day of trial said, I'm not ready. Can we please continue this? Can we please continue the case? And the trial judge there said, essentially, I don't have the exact quote, but essentially, forget about it. There's no way, that's the oldest trick in the book. That's not a similar situation to what's presented here. On the first day of trial, if the judge says, no, we're not continuing, we're going forward. That's a little different from a BCX hearing that's taking place a year before the case is set for trial. Well, two responses to that. First, Mr. Robinson's fitness is a critical question. The trial cannot continue unless his fitness is accurately determined, and I think the way that Judge Lynn responded is, the record shows that the way Judge Lynn responded was there was no way he was going to allow. You don't know that. Taking your statement, just as you said, that it is absolutely crucial for the defendant's fitness to be determined before the trial continues, just taking that statement alone, would it not then have been prudent to come back before Judge Lynn and say, Judge Lynn, we complied with your order. We have cooperated with what you have here first. We would still, in all due respect, like to request a private physician. Why not do that? What would have been the downside to doing that? Well, I would just, again, I think the way that Judge Lynn treated that request made it clear to counsel that that was not something that Judge Lynn was going to grant, and I understand that he did cooperate with Dr. Echevarria. He did bring it up again. You obviously think it's clear, but the fact that your opponent came to a completely different conclusion based on those very same statements suggests that maybe it wasn't so clear. I understand, but I think the way that Judge Lynn responded to that, and again, he said things such as, you know, he's running a meter for no good reason. He said, next, it's out of the question. I don't think this is the reason, deliberation that this important request merited, and I think Well, we, I think we can all agree that he denied the request at that time. My question goes to what I asked, the point that your opponent raised, which is why not bring the motion again because the judge did not close the door. His statements actually infer that perhaps if he cooperates with our, with what we have first, then we'll see. All I'm asking you is why wasn't that motion brought a second time? It's not clear from the record why. But you're the only one that's here, so you're the only person I can ask. I understand. Because that would add some clarity to it in terms of this judge really abused his discretion in not allowing it. We did what he said, we cooperated, and he still didn't allow it. I mean, wouldn't that have put more clarity around the issue that you're asking us to address? Yes. But, again, I think a fair reading of the record, the way that Judge Lynn responded is, and again, looking to people, V. Walker there, the defendant, you know, defense counsel didn't re-raise that request again at any point later. It was the manner in which that request was rejected is what the court found to be a compelling reason for the failure. Mr. Shookup, your position is pretty simple. We didn't do it because it would have been a useless act. That's your position. Right? I think that's a reflection of what Judge Lynn was saying. I think the one reason he did give is that he's not cooperating with them. I would do a softball, Mr. Shookup. I would have grabbed it, but he didn't want to do that. He didn't give the request. And I think the way that Judge Lynn, you know, the reason that Judge Lynn gave was not a fair reason. That was the opinion he was trying to rebut, and that's the problem. And just to respond to a couple other points, you know, in terms of the ZEHR, the state argues that the evidence was overwhelming, but I would focus the evidence on the issue of intent. There's no question that Mr. Robinson was there, that he was involved with this incident. The question is whether there was an intent to kill or not. And, again, that goes to the problem with the way the state charged their offenses, that during closing argument the issue was, was this intent to kill or not? And so, again, in terms of the 431B, we would ask that this court reverses convictions and remand for a new trial, as well as with the fitness issue. And just to respond briefly, the state argues that it should be a retrospective fitness hearing. This court certainly can decide that that's an appropriate thing to do if, based on this record, there's a fair and accurate way to determine now whether Mr. Robinson's fitness, but relevant factors include the delay. And it's almost three years ago now that Mr. Robinson was tried. And also, you know, I would reiterate all the problems. You know, he was denied the opportunity to get his, to get a court-appointed expert. The record wasn't developed in that manner. Judge Sachs refused to hold a hearing. And we don't have any record developed in terms of what occurred at the second day of trial. So I think, given the problems with the record, and that's another factor that this court recognized in people being e-sang to deny a retrospective fitness hearing, that we would ask that it's not appropriate in this case, and that the appropriate remedy should be to reverse his conviction and remand for a new trial. I gave your opponent, Mr. Busse, an opportunity to respond to the multiple convictions for the single act. What do you say? Well, I would just, I had cited in my brief to the case of people v. Drescher, which refers to a six-factor test. And the most important factor is what's in the indictment. That's the intent of the state is derived from that indictment. And the rest of the factors in that test all weigh in favor that this was just a group of acts. There was no intervening event. It was the same person. It was the same location. It was the same type of act. And then there was no division of the, when the state presented its opening statements, there was no, this is, these injuries go to this offense or anything to that effect. And then finally, in closing argument, as I mentioned, the closing argument was focused on Mr. Robinson's intent. He was there. There was an incident that occurred. It was whether Mr. Robinson was, had the intent to kill or not. And that's why the state discussed the injuries. They were severe. There was more than one. That's what shows his intent. And I have one last question. This, just out of curiosity, and you mentioned, you touched on this at the beginning. Why wasn't an opening statement presented by defense counsel in this case? It's not, defense counsel never explained. I couldn't tell from the record. That's why I'm asking. Right. He did not mention that. But, again, I would, I place some emphasis on that fact in the context of what defense counsel was telling Judge Etchingham, that the problems aren't just because of his suicide attempt today. And that distinguishes, by the way, cases cited by the state. Well, why would that preclude him from making an opening statement? Well, what I, I think if. In fact, it may be helpful to him. And, you know, I would think a clever lawyer could turn that, his counsel's, his client's behavior into a very sympathetic opening statement, for lack of a better term. Well, I don't think counsel was going to say that, you know, my client has a lot of mental health problems. But I think what, I think what it indicates is if, if what defense counsel was saying, which is he cannot communicate with his client, he's not going to promise the jury, you're going to hear from Mr. Robinson, here's what he's going to tell you. Because he's, you know, Mr. Robinson's not responding. He's not engaged with counsel at all about how to assist in his defense. So I think that, that based on what counsel was saying to Judge Etchingham, that provides an explanation for why there was no opening argument again. And again, this is a jury trial. And Mr. Robinson's testimony was a critical part. The jury asked to review it, which I would say also indicates that evidence was closely balanced on the issue of intent. So Mr. Robinson was a big, you know, whether he was going to testify was an important question. And the failure of, or the decision by defense counsel not to give an opening statement reflects that he was having difficulty with Mr. Robinson. Thank you very much, counsel. And this matter will be taken under advisement. And as I said at the beginning, Justice Hoffman will also be participating in the resolution of this case. Court's adjourned.